**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CHARLES RINGEL,                                          Case No: 1:12-cv-521

                        Plaintiff,                       Barrett, J.
            v.                                           Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

**REPORT AND RECOMMENDATION**

This case involves the thorny issue of how to determine whether a standard contingency fee agreement in a social security case should be approved as a "reasonable" fee, or reduced to avoid an impermissible "windfall." Pursuant to local practice, the attorney's motion for the award of such a fee has been referred to the undersigned for initial review. For the reasons stated, and adhering to five guideposts established by controlling case law, the undersigned recommends that the requested fee be reduced in this case.

### I.      Background

For a variety of reasons, the wheels of justice turn slowly in social security cases. This case presents a particularly egregious example. Plaintiff Charles Ringel alleges he became disabled more than a dozen years ago, in September 2005. After his March 2008 application for benefits was initially denied, Plaintiff's case remained under review by the Social Security Agency for more than four years, until May 2012, when the Appeals Council denied further review. Dissatisfied, Plaintiff, through counsel, filed a federal judicial appeal in July 2012.

Mr. Ringel's appeal was one of nearly 20,000 such appeals filed annually nationwide, and one of 42 filed by his attorney, Ms. Pehowic, that same year in this district alone.[1]  Although the percentage of adverse disability decisions appealed to the federal courts is a small fraction of the half million decisions decided annually at the administrative level, such appeals make up approximately 7% of all civil cases on federal court dockets, nearly all of which are referred to magistrate judges.[2]  In the cases in which a claimant[3] pursues such relief, a judicial appeal often meets with success.  Despite great variability among district courts, the rate of reversal on judicial appeal of adverse disability decisions nationally averages approximately 45%, with district courts within the Sixth Circuit remanding – on average - 36.9% of the time.[4]  According to a 2016 report, the Southern District of Ohio, which ranks among the "top ten" districts nationwide as measured by the number of decided cases, averages a 46.6% remand rate for SSA appeals, close to the national mean.[5]  Despite the large volume of social security appeals, few judicial decisions are published.

Just over four years ago, Mr. Ringel became a successful appellant, winning a

---

[1]According to the Court's cm/ecf system, Ms. Pehowic has been counsel in 146 social security appeals filed in this district.

[2]The number of decisions rendered by federal judges pales in comparison to the more than 500,000 decisions written annually by administrate law judges.  *See* Gelbach, Jonah and Marcus, David. *A Study of Social Security Litigation in the Federal Courts* (July 28, 2016).  Report prepared for Conference consideration available at https://www.acus.gov/report/report-study-social-security-litigation-federal-courts.  (hereinafter "2016 Full Report").

[3]At the administrative level, the individual seeking benefits is a claimant. While a plaintiff in the context of the judicial appeal filed in federal court, the terms claimant and plaintiff are used interchangeably.

[4]*See Short Report to the Judiciary on Social Security Litigation in Federal Courts* at * 7 (April 10, 2017), available at https://www.acus.gov (hereinafter "2017 Short Report").  Report prepared for Judicial Conference, summarizing ACUS 2016 Full Report, noting the variability of remand rates among and within circuits, ranging from 21% to 76% among the district courts.  *See also* 2016 Full Report at *83, stating that "outcomes in social security appeals differ strikingly across the 94 judicial districts."

[5]*See* 2016 Full Report, Table 1: District-Level Remand Rates for Cases Decided 2010-2013; *see also id.* at 90, n. 456.  Ms. Pehowic indicates that she is "presently reviewing" her cases, but that "[p]reliminary results show that less than one third get remanded." *See* Doc. 21 at 5, n.2.  However, an individual attorney's rate of remand is less relevant than the overall rate of remand, since a specific attorney's remand rate may be influenced by case and client selection, as well as the attorney's skill level.

remand for further administrative review of his disability claim under sentence four of 42 U.S.C. §405(g). (*See* Docs. 16, 17). After this Court entered Judgment, the Court granted Ms. Pehowic's unopposed motion for an award of her fees under the Equal Access to Justice Act ("EAJA"), awarding $3,315.00 for the hours put to effective use in this Court, plus the filing fee. (Doc. 20).

After remand, the case went through multiple additional administrative proceedings, resulting in the passage of several more years before Mr. Ringel at last obtained a favorable decision: an award of past-due benefits dating back to March 2007. Because benefits had accrued for more than a decade by the time that the May 2, 2017 Notice of Award was issued, the amount of those benefits had grown large, totaling $130,943.00. Based upon a contingency agreement signed in 2010, Ms. Pehowic timely filed a motion seeking an award of attorney's fees.[6] The motion seeks $26,735.75 as compensation for the 19.5 hours that counsel spent before this tribunal.[7]

The Commissioner filed a memorandum in opposition, arguing that the requested fee constitutes "a windfall at the expense of her disabled client." (Doc. 23 at 1). The Commissioner points out that the award sought by Plaintiff's counsel amounts to an extraordinarily high hourly rate, effectively $1,371 per hour.[8] Citing multiple cases in which fees have been reduced under similar "windfall" reasoning, and chiefly relying on

---

[6]Although Plaintiff is the party in whose name a §406(b) motion is filed, the real party in interest is Ms. Pehowic. *See Gisbrecht v. Barnhart*, 535 U.S. 789, 798 n.6, 122 S.Ct. 1817, 1823 n.6 (2002). The undersigned uses counsel's name herein to emphasize this point, because counsel's interests are inherently adverse to Plaintiff's in the windfall context.

[7]The Social Security Agency withheld 25% from Plaintiff's award of past-due benefits, pending a decision by this district court as to the amount of allowable fee for work performed in federal court. In cases in which no §406(b) fee motion is filed, or if the court awards less than the maximum allowable fee, any remaining funds are returned to the disabled plaintiff. Attorney fees for work performed at the administrative level are separately awarded by the Agency. *See* 42 U.S.C. § 406(a). Counsel may be compensated for work at the administrative level even if not successful. *See* 20 C.F.R. § 404.1725(b)(2).

[8]Although Ms. Pehowic calculates the rate at $1201 per hour, that calculation inappropriately subtracts the payment already received by counsel under the EAJA, as explained *infra*.

the Sixth Circuit's decision in *Lasley v. Com'r of Soc. Sec.,* 771 F.3d 308 (6th Cir. 2014), the Commissioner asks this Court to reduce the fee award to an effective rate of $400 per hour. In her reply memorandum, Ms. Pehowic offers to compromise her fee award to an effective rate of $750 per hour.

The undersigned now recommends that counsel's motion be granted, but that the award be reduced to an effective rate of $600.00 per hour, which appropriately honors the contingent nature of the fee contract, but avoids a windfall occasioned almost solely by the exceptionally slow pace of justice in this particular case.

## II. Analysis

### A. The Unique Nature of Contingency Fee Agreements in the Context of Social Security Appeals

The Social Security Act requires federal courts to "determine and allow as part of its judgment a <u>reasonable</u> fee…not in excess of 25 percent of the total of the past-due benefits to which the claimant is entitled…." 42 U.S.C. § 406(b)(1)(A) (emphasis added). By statutorily capping contingency fee contracts in social security cases at 25%, Congress attempted to protect often-desperate (and sometimes mentally incompetent) plaintiffs from giving up too much of their awards for the sake of obtaining legal representation.[9] The statute makes charging a fee in excess of the statutory cap a criminal offense. 42 U.S.C. § 406(b)(2).

Case law emphasizes the affirmative obligation of courts to determine whether a fee award is "reasonable," even when supported by an unopposed motion that relies on

---

[9]In many cases, the claimant is a minor, and in other cases, an adult alleges disability on the basis of severe mental and/or emotional limitations that may impact the capacity to enter into meaningful contingent agreements. In fact, remand in Mr. Ringel's case was required for further review of his mental impairments, including a psychotic disorder (with hallucinations), as well as depression and anxiety. The undersigned does not propose an evidentiary hearing on the capacity of Mr. Ringel to enter into a valid contingency agreement signed more than 7 years ago, but merely underscores this additional reason to avoid routine approval of all contingency agreements in the social security context.

a standard contingency fee agreement within the 25% statutory cap. *Lowery v. Com'r of Soc. Sec.*, 940 F. Supp.2d 689, 691 (S.D. Ohio 2013) (approving unopposed motion for fee where counsel did not request full 25% fee authorized by agreement, but instead voluntarily reduced fee to 14.5% of past-due benefits award). A primary reason for all this scrutiny is that, unlike the EAJA award received by Ms. Pehowic in 2014 for the same work, the §406(b) fee award is paid directly out of, and therefore directly reduces, the amount of the past-due benefits paid to the disabled claimant. *See e.g., Royzer v. Sec'y of Health & Human Servs.*, 900 F.2d 981, 982 (6th Cir. 1990) (reversing trial court's flat rejection of a contingent fee agreement, but warning that "[c]ontingent fees in social security cases are different than in other cases of the law because Congress has put the responsibility on the federal judiciary to make sure that fees charged are reasonable and do not unduly erode the claimant's benefits").

Still, federal courts – far more accustomed to enforcing contracts than to breaking them - are understandably reluctant to rewrite the key term of a facially valid contract for payment between a lawyer and his/her client. Because standard contingency agreements universally seek the statutory maximum fee,[10] courts have only two choices: to approve the 25% contract as written or to reduce that award, implicitly voiding the contract. Yet, if fees are reduced below the contracted amount, will counsel still be fairly compensated for what clearly was meritorious work? If too many contingency fee awards are reduced by courts, will practitioners disappear, leaving no

---

[10] *Gisbrecht*, 535 U.S. at 803-804 (acknowledging near-universal existence of contingent fee contracts in social security context that provide for the statutory maximum fee of 25% of any past-due benefits award). Despite some courts' reference to the fiction that such contracts represent a "negotiated" fee, *Gisbrecht* acknowledged the reality that, at least in the present-day context of social security appeals, standard contingency fee contracts more closely resemble adherence contracts, for which claimants may be limited to a "take it-or-leave it" bargain. *Id.,* 535 U.S. at 808 n.15 (acknowledging dissent, *id.,* 122 S. Ct. at 1830, but expressing the belief that judicial oversight will prevent abuse).

one to file judicial appeals on behalf of worthy claimants who have no ability to do so themselves?  After all, "[r]ational plaintiffs – or their representatives – do not embark on extended litigation journeys unless they think they are sufficiently likely to win or expect to gain something very valuable when they do win (or both)." *A Study of Social Security Litigation in the Federal Courts*, 2016 Full Report at 99.

Thus, review of §406(b) fee motions continues to challenge trial courts.  Although the instant motion is contested, most such motions are unopposed since the only party with any financial incentive is the disabled claimant, who previously agreed to the contingent fee agreement and whose attorney has filed the motion with his client's presumed consent. Unopposed motions are more likely to be granted by busy courts.

Unlike the underlying judicial appeal or an EAJA award, the Commissioner has no direct financial stake in the §406(b) fee.  Filing any opposition to a fee motion not only requires the Commissioner's attorney to devote scarce resources to briefing a matter in which his client will not benefit, but also requires counsel to reverse his/her earlier role and advocate in support of the Commissioner's previous opponent, who has not asked for such assistance.[11]  *Accord Wells v. Sullivan*, 907 F.2d 367, 372 (2nd Cir. 1990) (noting "the anomalous role of the Social Security Administration in first denying benefits to a claimant, and then after losing the case, posing as a protector of the plaintiff, but spending more time and money in order to reduce the fees to be paid to the claimant's attorney.")   In cases like Mr. Ringel's, the Supreme Court accurately predicted that the Commissioner would play "a part… resembling that of a trustee for the claimants," *see Gisbrecht,* 535 U.S. at 798 n.6, but scores of unopposed motions

---

[11]Of course, there are times when the Commissioner jointly agrees with Plaintiff to a remand that later results in an award of benefits.  However, most § 406(b) motions are filed in contested judicial appeals decided by this Court in favor of the Plaintiff.

give testament that such opposition remains rare. *See Bailey v. Heckler*, 777 F.2d 1167, 1169 (6th Cir. 1985) (rejecting argument that the fee should be approved because it is unopposed, since "claimant is unlikely to object to an allowance of a fee in accordance with his contingent fee arrangement, for, rightly or wrongly, he will usually give the lawyer all of the credit for the success in winning an award of benefits for him")(internal quotation and citation omitted). Unfortunately, in some cases in which the Commissioner has filed opposition in a limited "trustee" role, the effort has been met with hostility from the reviewing court.[12]

### B. The Evolution of "Windfall" Case Law: In Search of Consistency

Consistency is the hallmark of any effective judicial system. In the context of social security fee awards, inconsistency persists.[13] The lack of consistency feeds upon itself, encouraging satellite litigation that results in more time spent trying to determine a fee award than on the merits of the underlying case. With the modest ambition of amplifying the concerns previously expressed in controlling case law, including but not limited to the Sixth Circuit's decision in *Lasley v. Com'r*, the undersigned magistrate judge undertakes the Sisyphean task of clarifying when a discretionary award of a

---

[12]*See, e.g., Sykes v. Commissioner*, 144 F. Supp.3d 919 (E.D. Mich. 2015) (strongly criticizing the Commissioner, who made clear he did not and could not represent the plaintiff, for opposing a §406(b) motion that sought a fee more than four times the standard rate, as offering "misguided" and "specious" arguments. In an approach the undersigned respectfully believes to run counter to both *Gisbrecht* and Sixth Circuit case law, the Michigan court also criticized the Commissioner for suggesting that the attorney consider a written compromise or settlement with his client as "disregard[ing] the obvious fact that plaintiff and his attorney" already agreed on a 25% contingent fee.)

[13]In *Rodriquez v. Bowen*, 865 F.2d 739, 746 (6th Cir. 1989)(*en banc*), the Sixth Circuit described a "chaotic battleground of inconsistency" in fee awards. The following year, the court again noted the "plethora of ad hoc decisions which generated a considerable number of appeals" that led to *Rodriquez*, and the Sixth Circuit's "attempt to make fee decisions more uniform and predictable." *Royzer v. Sec'y*, 900 F.2d at 982; *Hayes v. Secretary of Health and Human Servs.*, 923 F.2d 418, 422 (6th Cir. 1990)(expressing dismay over the continuing "confusion" in the lower courts in determining the existence of a windfall). *See also Jeter v. Astrue*, 622 F.3d 371 (5th Cir. 2010) (noting the "confusion and conflicting outcomes in the decisions of our lower courts" concerning the windfall analysis).

§406(b) contingency fee amounts to an impermissible windfall.[14]

I begin with *Gisbrecht v. Barnhart*, 535 U.S. 789, 803, 122 S.Ct. 1817 (2002), a case that was not limited to the problem of the windfall fee, but tackled in a larger context a split among circuits in their approach to ascertaining a "reasonable" statutory fee. The Ninth Circuit used a strict "lodestar" approach, defining a "reasonable rate" almost *solely* by reference to a standard hourly rate times the number of hours expended, consistent with fee-shifting statutes. In so doing, the Ninth Circuit declined to give effect to contingency fee agreements, allowing courts to consider them as only one of a dozen factors that could hypothetically alter the lodestar rate, but with no requirement that courts so much as articulate that consideration. By contrast, the Sixth Circuit started not with a flat lodestar fee, but with the contingency fee agreement, giving those agreements presumptive but not absolute weight. *See Rodriquez v. Bowen*, 865 F.2d 739, 746 (6th Cir. 1989)(*en banc*).

In *Gisbrecht*, the Supreme Court favored the Sixth Circuit's approach. The Court held that "Congress…designed §406(b) to control, not to displace, fee agreements between Social Security benefits and their counsel." *Id.,* 535 U.S. at 793. *Gisbrecht* leaves no doubt as to the court's role in checking the reasonableness of every fee. *See id.,* 535 U.S. at 807 and n.15 (stating that statute requires court review "as an independent check, to assure that they [contingent awards] yield reasonable results in particular cases.") Thus, *Gisbrecht* instructs trial courts to begin their analysis with the contingent agreement, but not to end with it. Instead, courts should test the contingent fee for reasonableness, reducing it as needed not only for attorney misconduct or

---

[14]The undersigned seeks publication of this R&R in furtherance of consistency within this district.

delay,[15] but also "[i]f the benefits are large in comparison to the amount of time counsel spent on the case." (*Id.* at 808, citing *Rodriquez*, 865 F.2d at 747). The latter reduction – which can occur *even without any hint of misconduct by counsel* - seeks to avoid an unreasonable "windfall," and is the heart of the issue presented in this case.

*Gisbrecht*'s core holding was to reject the Ninth Circuit's failure to give "primacy" (or often any weight at all) to the standard 25% contingent agreement, in favor of the Sixth Circuit's approach. *Rodriquez* instructed trial courts to use the standard 25% agreements "as a starting point," affording such agreements a "rebuttable presumption" of reasonability, but "emphasiz[ing] that it [the agreement] is not be viewed as *per se* reasonable." *Id.*, 865 F.2d at 746.[16] Instead, deductions should be made for misconduct, ineffectiveness, or if counsel would "enjoy a windfall because of **either** an inordinately large benefit award **or** from minimal effort expended." *Id.* (emphasis added); *accord Lowery v. Com'r*, 940 F. Supp.2d at 692.

Prior to *Gisbrecht*'s endorsement of the *Rodriquez* approach, courts within the Sixth Circuit remained inconsistent, particularly in the windfall determination. In *Hayes v. Sec'y of HHS*, 923 F.2d 418 (6th Cir. 1990), the Sixth Circuit tried to rein in that inconsistency by announcing a simple-to-use guidepost to curtail but not eliminate trial

---

[15]A review of recent case law suggests that it is rare for the conduct of counsel to provide cause for significant reduction, unless the fee motion itself is untimely. Since 2016, Local Rule 54.2(b) has made clear that any motion seeking a fee award under the Social Security Act, 42 U.S.C. § 406(b), must be filed "no later than forty-five days after entry of judgment or the date shown on the face of the social security certificate award (notice of award), whichever is later." *See e.g., McCluskey v. Com'r of Soc. Sec.*, 2016 WL 6836353 (S.D. Ohio Nov. 16, 2016) (fee denied to Ms. Pehowic based upon untimeliness of motion); *Iames v. Com'r*, 2017 WL 574931 (S.D. Ohio Jan 25, 2017), adopted at 2017 WL 567939 (S.D. Ohio Feb. 13, 2017)(same).

[16]*Gisbrecht* cited with approval the petitioners' concession in that case that a contingent fee agreement "*does not create any presumption in favor of the agreed upon amount.* To the contrary, because section 406(b) requires an affirmative judicial finding that the fee allowed is 'reasonable,' the attorney bears the burden of persuasion that the statutory requirement has been satisfied." *Id.*, 535 U.S. 807 n.17 (emphasis added). However, a "modified" rebuttable presumption continues to apply in the Sixth Circuit. *See Lasley v. Com'r*, 771 F.3d at 309.

court discretion to define a *Rodriquez* windfall.[17]  Foreshadowing *Gisbrecht*, *Hayes* rejected the approach of some courts to reduce nearly every contingency fee to "a flat hourly rate a particular court deems reasonable," typically a standard rate of $100-125, even in the absence of an "inordinately high benefit award" or "minimal effort" that the windfall rule was designed to protect against.  *Id.*, 923 F.2d at 421.   Instead, *Hayes* acknowledged that a premium may be paid without turning the fee into a windfall, due to the contingent nature of recovery.   Citing evidence that judicial appeals are won nearly half the time, *Hayes* fashioned a test akin to a lodestar-times-two:

> [U]nder *Rodriquez,* a windfall can never occur when, in a case where a contingent fee contract exists, the hypothetical hourly rate determined by dividing the number of hours worked for the claimant into the amount of the fee permitted under the contract is less than twice the standard rate for such work in the relevant market.   We believe that a multiplier of 2 is appropriate as a floor in light of indications that social security attorneys are successful in approximately 50% of the cases they file in the courts.   Without a multiplier, a strict hourly rate limitation would insure that social security attorneys would not, averaged over many cases, be compensated adequately….

> A calculation of a hypothetical hourly rate that is twice the standard rate is a starting point for conducting the *Rodriquez* analysis. It provides a floor, below which a district court has no basis for questioning, under the second part of *Rodriquez* 's windfall rule…, the reasonableness of the fee. In other words, a hypothetical hourly rate that is less than twice the standard rate is *per se* reasonable, and a hypothetical hourly rate that is equal to or greater than twice the standard rate may well be reasonable.

> If the calculated hourly rate is above this floor, then the court may consider arguments designed to rebut the presumed reasonableness of the attorney's fee.   Such arguments may include, without limitation, a consideration of what proportion of the hours worked constituted attorney time as opposed to clerical or paralegal time and the degree of difficulty of the case. Factors such as these should inform the district court's [windfall] determination....

---

[17]The *Hayes* test was the second mathematical formula announced by the Sixth Circuit, following an earlier formula set forth in *Dearing v. Sec'y of Health and Human Servs.*, 815 F.2d 1082 (6th Cir. 1987).   As discussed below, while the *Hayes* test became an enduring guidepost, the *Dearing* formula has been largely forgotten.

*Id.*, 923 F.2d at 422.

Post-*Gisbrecht*, trial courts have continued to use the elegantly simple *Hayes* test as a method by which to determine whether a contracted contingent fee should be further reviewed to ensure it does not constitute a windfall. In November 2014, in *Lasley v. Com'r of Soc. Sec.*, 771 F.3d 308 (6th Cir. 2014), the Sixth Circuit confirmed the continuing vitality of the *Hayes* test, and affirmed the use of additional guideposts that offer the promise of greater consistency. In *Lasley,* the undersigned had reasoned:

> [A] hypothetical hourly rate that is more than twice the standard rate will not automatically be held to constitute an unreasonable 'windfall,' because to do so would be to place a stricter cap on a contingency agreement than is statutorily required. However, the Sixth Circuit has explained that when the contingency fee agreement results in a calculated hourly rate that exceeds "twice the standard rate for such work in the relevant market," then the court should consider "arguments designed to rebut the presumed reasonableness of the attorney's fee." *Hayes*, 923 F.2d at 422

Case No. 1:10-cv-394 (Doc. 19 at *16, R&R filed 7/29/13, adopted at Doc. 23, Order of 11/22/13). On appeal, Plaintiff's counsel argued that this Court had failed to comply with the *Hayes* presumption. "Not so," declared the Sixth Circuit, citing to the quoted language and reiterating that "nothing in *Hayes* prevents a court from *considering* arguments rebutting the presumption of reasonableness." *Id.* at 309.

*Lasley* affirmed this Court's discretionary reduction of a contingency fee as a windfall, where counsel sought an effective rate of $733 per hour, which rate "grossly exceeded – indeed more than quadrupled – the standard rates applied to social security fee requests in the Southern District of Ohio." *Id.*, 881 F.3d at 310. At the trial court level, the undersigned had explained that a reduction to an effective hourly rate of $360 per hour was appropriate based on multiple factors, including counsel's delay in filing the fee petition, his "extremely high claimed hourly rate, the opposition of the

Commissioner (ordinarily a disinterested party to §406(b) motions), the lack of any offer to negotiate or reduce the fee to the benefit of the Plaintiff in order to reduce the likelihood of a windfall to counsel, the relative brevity of representation in this Court, and the relative simplicity of the claim presented to this Court." (R&R, Doc. 19 at 17).

Shortly after *Lasley* but with little discussion of that case, a Michigan district court issued a published opinion on a §406(b) windfall issue, advocating a retreat from the use of effective hourly rates as a benchmark.[18] *See Sykes v. Com'r of Soc. Sec.*, 144 F.Supp.3d 919 (E.D. Mich. 2015). For the reasons explained below, the undersigned finds much of *Sykes* to be inconsistent with both *Gisbrecht* and *Lasley*. In contrast to the view expressed in *Sykes*, in *Gisbrecht*, the Supreme Court expressly endorsed the use of hourly rates to determine whether the contingent fee that results is a "windfall." *Id.*, 535 U.S. at 808 (suggesting that "the court may require the claimant's attorney to submit, not as a basis for satellite litigation, but as an aid to the court's assessment of the reasonableness of the fee yielded by the fee agreement, a record of the hours spent…and a statement of the lawyer's normal hourly billing charge for noncontingent-fee cases.") While *Lasley* offers additional controlling guidance in the windfall analysis, to the extent that the Sixth Circuit's existing guideposts require further illumination, the undersigned finds more persuasive the Fifth Circuit's widely cited decision in *Jeter v. Astrue*, 622 F.2d 371 (5th Cir. 2010).[19]

In *Jeter*, the Fifth Circuit addressed head on the difficulty that trial courts have had in following *Gisbrecht* in determining windfall.

The *Gisbrecht* Court began by explicitly rejecting the application of the "lodestar method to calculate fees under § 406(b),"*Gisbrecht,* 535 U.S. at

---

[18]*Sykes* cited to *Lasley* but did not discuss its facts or analysis.
[19]*Jeter* has been cited nearly 100 times by courts across the country, including by district courts within the First, Fourth, Fifth, Seventh, and Eighth, Eleventh and D.C. Circuits.

798, 122 S.Ct. 1817, and then concluded by stating that "[i]f the benefits [resulting from the contingency fee] are large in comparison to the amount of time counsel spent on the case, a downward adjustment is similarly in order [to] ... disallow *windfalls* for lawyers." *Id.* at 808, 122 S.Ct. 1817 (internal citations and quotation marks omitted) (emphasis added). We are not surprised that many of our lower courts have interpreted this as a contradictory mandate: lower courts must not employ the lodestar method to determine whether the hourly rate is excessively high and the fee thus unreasonable, but if the hourly rate is excessively high, then lower courts may declare the fee to be a *windfall* and, ultimately, unreasonable.

*Jeter v. Astrue*, 622 F.3d at 377)(footnotes omitted).[20]

> And so the question post-*Gisbrecht* is really the following: if lower courts are not to resort first to the lodestar method when determining whether a fee is reasonable under § 406(b), may a lower court give the lodestar method *any* consideration in its determination of whether a contingency fee constitutes a "windfall"?

*Id.*, 622 F.3d at 379–80. Answering in the affirmative, *Jeter* concluded that *Gisbrecht*

does not forbid use of a lodestar but rather, forbids only the *exclusive* use of a lodestar

(without regard to contingency fee agreements) in the evaluation of §406(b) motions.

By contrast, when a court conducts the windfall inquiry, reference to the hourly rate is

wholly appropriate. *Id.,* 622 F.3d at 377. Sensibly, *Jeter* concluded that courts

> may consider the lodestar in their analyses so long as the court can articulate additional factors demonstrating that the excessively high fee would result in an unearned advantage. In other words, the *Gisbrecht* Court's reference to windfall leaves room for consideration of an effective hourly fee rate, but only so long as this mathematical calculation is accompanied by consideration of whether an attorney's success is attributable to his own work or instead to some unearned advantage for which it would not be reasonable to compensate him.

---

[20]Justice Scalia pointed out the same anomaly in his dissent, noting that the majority seemed to challenge trial courts to "commence…with the contingent fee agreement, but then to adjust the figure that agreement produces on the basis of factors (most notably, the actual time spent multiplied by a reasonable hourly rate, *ante*, at 1828) that are, in a sense, the precise antithesis of the contingent-fee agreement…." *Gisbrecht*, 122 S.Ct. at 1829 (dissent).

*Id.*, 622 F.3d at 380. In the Sixth Circuit, *Hayes* strongly emphasizes the utility of the effective hourly rate in the windfall analysis. *Jeter*'s analysis is consistent with *Rodriquez*, *Hayes*, and the more recent *Lasley*.

In contrast to *Jeter*, the Michigan court in *Sykes* viewed *Gisbrecht a*s forbidding use of the hourly rate as a benchmark. Because the Commissioner had used that benchmark to argue on the plaintiff's behalf that the fee amounted to a windfall, *Sykes* heavily criticized "the Commissioner's "fixation on the hourly rate [as] contrary to the plain holding of *Gisbrecht,* in which the Supreme Court rejected the lodestar method of fee review in non-fee-shifting cases," *id.* at 925. Continuing the presumption that *Gisbrect* wholly "rejected" use of hourly rates, *Sykes* also dismissed the Commissioner's proposal that a "reasonable" rate would be a multiplier of 3.4 times counsel's "stated usual hourly rate of $150." *Id.* Uneasily acknowledging the Sixth Circuit's use of the *Hayes* test despite what it viewed as *Gisbrecht*'s avoidance of hourly reference points, *Sykes* reasoned that any use of an effective hourly rate should be relegated to "a *marginal*, not a *central* guidepost." *Id.* at 925 (emphasis original).

However, in *Lasley* the Sixth Circuit expressly affirmed the continuing *central* role of the *Hayes* test in assessing whether a contingent fee may be a windfall, as well as use of the same mathematical formula as a guidepost to determine a reasonable fee in the subset of cases that exceed the *Hayes* floor.[21] Additionally, both *Gisbrecht* and Sixth Circuit authority undermine the assumption in *Sykes* that no windfall reduction can be made unless counsel's own misconduct or "nominal effort" contributed to the inordinately large fee. *Gisbrecht* confirmed that a contingent fee agreement may result

---

[21]*Contrast Sykes*, 144 F.Supp.3d at 925 (suggesting that the calculation should not be used "to establish what would be a reasonable hourly fee," but only as "a 'sanity check' that might give one indication that the fee agreement would result in a disturbingly large fee for only nominal effort expended by plaintiff's counsel").

in an inordinately large – and therefore unreasonable - fee merely by virtue of the benefits being large "in *comparison* to the amount of time counsel spent on the case." *Gisbrecht*, 535 U.S. at 808 (emphasis added). In short, both *Gisbrecht* and Sixth Circuit authority through *Lasley* support reducing a contingent fee to avoid a windfall even if counsel gave more than "minimal" effort and did nothing wrong, where only the passage of time has caused the inordinately large benefit award. *See also Rodriquez*, 865 F.2d at 746, 747 (defining a windfall as resulting from "*either an inordinately large benefit award or* from minimal effort expended," and noting that "with the best of will on the part of the claimant's lawyer, these disability cases are frequently drawn out over a considerable period of time.")(emphasis added, internal quotation omitted). The instant case illustrates this point.

### C. Applying the Guideposts: Simplifying the Windfall Analysis

### 1. The *Hayes* Test

#### a. Defining the Standard Rate

The *Hayes* test endures as a model of simplicity. If the contingency fee agreement produces an award that is less than the sum of 2 times the "standard rate," then the windfall analysis is complete.[22] Nevertheless, a fog can obscure this clear lens when the definition of the "standard rate" is challenged, as Ms. Pehowic attempts to do in this case. There is no need for such obscurity.

Returning to *Gisbrecht* (which cited only *Rodriquez*, not *Hayes*), the Supreme Court suggested that to assess windfall, trial courts could compare evidence of an attorney's "normal hourly billing charge for noncontingent-fee cases" to the effective

---

[22]In the undersigned's experience, most §406(b) motions result in fees below the *Hayes* floor. However, the *Hayes* test applies only to a court's windfall analysis and not to attorney misconduct or other discretionary reductions authorized by § 406(b).

hourly rate produced by a contingent fee agreement. *Gisbrecht*, 535 U.S. at 808. Where an attorney has a "standard rate" for comparable noncontingent fee cases, it is appropriate for this Court to consider such evidence. As a practical matter, however, few attorneys who practice exclusively in the area of social security law will be able to produce such evidence, because like Ms. Pehowic, they simply do not take on noncontingent fee cases.[23]

Barring any evidence of counsel's standard rate in noncontingent social security cases,[24] courts have adopted the hourly rate that the attorney receives under the EAJA as proxy for the "standard rate" in the *Hayes* test. EAJA compensation rates work well as a standard rate in the *Hayes* test because in the typical social security case, the EAJA provides the only other means by which counsel may be compensated for work performed in a judicial appeal of a social security case. In fact, *Hayes* itself referenced hourly rates that appear derived from the EAJA. *Id.*, 923 F.2d at 420 (referring to standard rates of $100-125);[25] s*ee also Jeter*, 622 F.3d at 381 n.11 (affirming downward departure from effective hourly rate of $846.88 per hour to an award of $312.40 per hour, reflecting a rate of $125 multiplied by 2.5).

---

[23] In an affidavit filed on April 4, 2014 in this case in support of her prior motion for an award of an EAJA fee, Ms. Pehowic states that she was admitted to practice 10 years before this case was filed, first began working on social security matters in 2005, and presently handles only social security cases, taking all cases "strictly on a contingent basis." (Doc. 19-1).

[24] Even in cases in which a claimant's attorney has a non-contingent fee practice, in an era of growing flat-fee and hybrid methods of compensation, the practice may be so limited or different from the social security practice that it is not representative. If the standard rate for an attorney who practices exclusively in social security law is tied to the EAJA rate, is it appropriate to pay a higher hourly rate to counsel who practices primarily in a more lucrative area of the law, with little social security experience – for what may also be additional hours due to his/her lack of expertise?

[25] At the time *Hayes* was published, 28 U.S.C. §2412 provided for an EAJA rate of $75 per hour in the absence of an increase by the court. Case law from that time period confirms that cost-of-living adjusted hourly rates for EAJA awards ranged from $100-125. *See e.g., Hull v. Bowen*, 748 F. Supp. 514, 526 n. 14 (N.D. Ohio 1990).

Using an EAJA-based fee for the *Hayes* test assures consistency, since the same attorney usually will have recovered that rate for the same work. Using that standard also decreases the complexity required for courts to perform the requisite §406(b) analysis and keeps intact the intended simplicity of *Hayes*, while decreasing satellite litigation over the definition of the "standard rate." Additionally, the EAJA inflation-adjusted rate has been widely adopted in a clear majority of unpublished cases employing the *Hayes* test. *See e.g., Hicks v. Com'r*, 2016 WL 7634457 (reducing Ms. Pehowic's contingent fee from hypothetical rate of $1414 per hour to $360 per hour), adopted at 2017 WL 25524 (S.D. Ohio Jan. 3 2017)(Barrett, J.); *Jones v. Astrue*, 2012 WL 3251865 (reducing effective hourly rate from $750 to twice-times $180 per hour), adopted at 2012 WL 3763909 (S.D. Ohio, Aug. 29, 2012)(Rice, J.); *Tharp v. Com'r*, 2011 WL 3438431 (S.D. Ohio Aug. 5, 2011)(Barrett, J., reducing request that resulted in effective rate of $1371.75 per hour to $356 per hour, determining that twice the EAJA hourly rate resulted in a reasonable contingent fee); *Edwards v. Com'r of Soc. Sec.*, 2011 WL 1002186 (S.D. Ohio March 16, 2011)(Dlott, J., approving calculated hourly rate of $312 as "less than twice the $165 hourly rate approved under the EAJA"); *see also Woods v. Colvin*, 2014 WL 2918454 at 5, n.6 (N.D. Ohio June 26, 2014) (accepting different standard rate in light of lack of objection by Commissioner, but noting that most cases use EAJA rates).

Not only has this Court used the EAJA rate of payment as proxy for the "standard rate" in the *Hayes* equation in most cases, but the Sixth Circuit expressly affirmed that approach in *Lasley v. Com'r*. Pointing to the lack of evidence of any "contrary standard rate," the Sixth Circuit acknowledged this Court's use of an EAJA-based "standard rate"

as the "standard rate[] applied to social security fee requests in the Southern District of Ohio." *Id.*, 771 F.3d at 310.

In her motion, Ms. Pehowic advocates for a different approach that would result in a much higher – and in the undersigned's view – artificially inflated - "standard rate." Ms. Pehowic generally proposes a rate in excess of $200 per hour, based upon a 2004 survey of average rates in the downtown Cincinnati area and an Ohio State Bar Association report, *The Economics of Law Practice in Ohio 2013,* that reflect billing rates ranging from $325 per hour at the 75th percentile to $350 per hour at the 95th percentile for social security attorneys, with even higher hourly rates for attorneys across all areas of practice with 26-35 years of experience. Of course, redefining the "standard rate" at a higher value will exempt a correspondingly higher percentage of contingent fee awards from further windfall scrutiny under *Hayes.*

Ms. Pehowic's argument mirrors the approach used in *Sykes*, which selected the "highest rate" published in a Michigan bar survey as a "standard rate." Ironically, the claimant's counsel in Sykes provided *Gisbrecht* evidence by representing his normal billing rate was $150 per hour, which the Commissioner used as his "standard rate" for the *Hayes* test. However, *Sykes* reasoned that the definition of the "standard rate" used in *Hayes* was open to interpretation, based on the fact that the Sixth Circuit "never has endorsed any particular nominal figure…for the 'standard hourly rate' applicable to the litigation of civil actions under the Social Security Act." *Sykes v. Com'r*, 144 F. Supp.3d at 924. *Sykes* proceeded to adopt the rationale that the "standard rate" should not be "composed from average or typical hourly rates" but instead should reflect "the *highest* rate routinely accepted in the sort of practice at issue in the relevant market." Id. at 925. (emphasis added). Citing an unpublished case that had summarily used the same

reference,[26] the *Sykes* court instead used as a "standard" the highest published rates for "public benefits practice" or ERISA attorneys, who typically are compensated at rates higher than social security practitioners, at least according to the Ohio Bar Association report cited by Ms. Pehowic. *Sykes* reasoned:

> Counsel's stated hourly rate of $150 is particularly inapposite as a benchmark, where it is below the 25th percentile ($180) of reported usual hourly rates for attorneys in public benefits practice in the State of Michigan. *See* State Bar of Michigan, Economics of Law Practice in Michigan, at 11 (2014), http://www.michbar.org/pmrc/ articles/0000152.pdf. The 95th percentile figure is, for the present purpose, a more appropriate indicator of an upper bound for the "standard rate" charged by attorneys in this state for the type of practice involved in this case. If an attorney's application for fees were found, in a particular case, to suggest an effective hourly rate higher than that charged by 95% of his colleagues, then such a figure might indicate cause for concern. Such is not the case here.

*Id.*, 144 F.Supp.3d at 925–26.

The undersigned respectfully disagrees with this rationale. In the phrase "standard rate," the word "standard" is an adjective, akin in meaning to "normal," "average," or "typical." The suggestion by *Sykes* that the *Hayes* use of a "standard rate" should not represent "*average or typical* hourly rates" but instead should reflect "the *highest* rate routinely accepted" flips on its head the most common meaning, and undercuts the rationale of *Hayes* for choosing a multiplier of 2. Moreover, in rejecting evidence of the plaintiff attorney's stated hourly billing rate of $150, *Sykes* disregards *Gisbrecht* (which suggested as a comparison rate the attorney's "normal" rate for non-contingent work). Finally, while a different "standard rate" (even if EAJA-based) may apply in other districts, *Lasley* recognized and affirmed this Court's use of an EAJA rate

---

[26]*See Drenning v. Com'r*, 2014 WL 4705113, at *4 (E.D. Mich. Sept. 21, 2014)(concluding that an unopposed motion for 406(b) fee was "permissible" because it was not more than twice the standard hourly rate of public benefits attorneys whose hourly rates at the 75-95th percentile ranged from $250-500 per hour).

as the "standard rate" in the Southern District of Ohio. In short, the EAJA-based "standard rate" has been sufficiently established in the Southern District of Ohio to be entitled to presumptive weight under *Hayes* in the absence of evidence of counsel's normal billing rate for comparable, noncontingent work. Ms. Pehowic's proffer of state bar data does not overcome that presumption.

Importantly, the presumptive use of EAJA rates in the *Hayes* test does build in consideration of state bar data over time, because the EAJA rate ultimately is derived from that data. Submission of state bar data makes a great deal of sense in the EAJA context, where the focus is <u>exclusively</u> on the statutory rate and lodestar, as opposed to the §406(b) context, in which the *Hayes* test is only the first of several factors used to evaluate windfall. The EAJA limits counsel to an hourly rate of $125 "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved justifies a higher fee." 28 U.S.C. §2412(d)(2)(A). In *Coursey v. Com'r of Soc. Sec.*, 843 F.3d 1095 (6th Cir. 2016), the Sixth Circuit confirmed that EAJA awards are to be based both on cost of living factors and evidence of "the prevailing market rate in the local community," which includes state bar reports. *Accord Clark v. Com'r of Soc. Sec.*, 849 F.3d 647 (6th Cir. 2016); *Minor v. Com'r of Soc. Sec.*, 826 F.3d 878 (6th Cir. 2016)(holding it was error for a district court to reject state bar report without offering an explanation of its inadequacy, for purposes of calculating hourly rate under EAJA).

Although the undersigned has explained the basis for concluding that Ms. Pehowic's previously awarded EAJA rate should be used as her standard rate for purposes of the *Hayes* test, to the extent a reviewing court may disagree, the undersigned writes further to explain why the data offered by Ms. Pehowic is particularly

unpersuasive.  First, the 2013 OSBA report reflects that only six practitioners of social security law statewide reported their billing rates, a very small sample size.  Further complicating the issue is the fact that virtually all social security cases are taken on a contingency basis, leaving the undersigned to wonder whether the few practitioners who responded are an anomaly unto themselves.  The same report reflects widespread gender disparities in hourly billing rates, and that social security practitioners may earn less than attorneys who practice in other areas.  Even if the extremely small sample size is considered, their "median" hourly billing rate is $250.  And, Ms. Pehowic's reference to attorneys with more than 26 years of practice is perplexing since she had practiced for 10 years at the time she worked on this case.  The hourly rate for attorneys across all areas of practice with 6-25 years of practice was $200.  Other statistics cited by Plaintiff make no distinction between partners at large downtown firms practicing in the areas of health care or environmental law, and the solo practitioner practicing social security or family law.  In contrast to any of the referenced data, counsel states that she exclusively handles social security disability claims on a contingent fee basis, and admittedly earns "a great deal less than $350 per hour" in the cases in which she files judicial appeals. (Doc. 21 at 5).  In short, the undersigned finds the amount previously awarded to Ms. Pehowic under the EAJA for the same work in this case ($170 per hour) is an appropriate standard rate.

### b.  The Second Half of *Hayes*:  The Higher the Multiplier, the More Likely a Windfall

*Hayes* held, consistent with *Gisbrecht*, that some level of premium should be paid based on the contingent nature of social security cases.  *Hayes* chose a multiplier of 2 times the "standard rate" to reflect that premium, given that social security cases

are routinely taken on a contingent basis, but are "won" approximately half the time in federal court. The average remand rate for social security appeals has not significantly changed in the decades since *Hayes* was decided. To that extent, the Hayes rationale for selecting a multiplier of 2 remains intact.[27]

*Hayes* established a multiplier of 2 as its floor, but did not designate any ceiling other than the 25% statutory cap. Instead, *Hayes* left it to trial courts to determine in individual cases when a higher multiplier is reasonable, holding only that "a hypothetical hourly rate that is less than twice the standard rate is *per se* reasonable, and a hypothetical hourly rate that is equal to or greater than twice the standard rate may well be reasonable." *Id.*, 923 F.2d at 427.

In this case, Ms. Pehowic's motion requested an amount more than 8 times her previously awarded EAJA rate. In her reply memorandum, she offers to reduce her award, but still seeks a fee that is 4.4 times her prior fee for the same work. Although she bears the burden of persuasion, see *Gisbrecht*, 535 U.S. at 807 n.17, Ms. Pehowic offers little justification for so high a multiplier other than to cite the contingent nature of the work and the fact that similarly high awards have been approved in unpublished cases in this district, including two cases in which she was awarded (on *unopposed* motions) effective hourly rates of $689 and $912.[28] However, in other cases involving unopposed motions, Ms. Pehowic has sought an award that falls at or below the *Hayes* floor. *See e.g., Reed v. Com'r*, 2017 WL 4276655 (S.D. Ohio Sept. 27, 2017)(awarding

---

[27]At the same time, *Hayes* pointed to the remand rate as opposed to the somewhat smaller percentage of cases in which past-due benefits are awarded after a judicial remand. Nearly all remands will entitle counsel to recover an EAJA fee, but not all remands result in an award of past-due benefits from which counsel may seek an additional fee under §406(b).

[28]The undersigned also finds unpersuasive Plaintiff's reliance on West Virginia and California cases. Aside from being outside this jurisdiction, those cases were decided when the "reasonable" standard was still evolving.

$350 effective hourly rate to Ms. Pehowic); *Porter v. Com'r*, 2016 WL 4681222 (S.D. Ohio Sept 7, 2016)(awarding $225 effective hourly rate); *Saunders v. Com'r*, 2015 WL 859557 (S.D. Ohio Feb. 27, 2015)(awarding $280 effective hourly rate). And in cases in which the Commissioner has opposed her §406(b) motions, Ms. Pehowic has received lower awards. *See, e.g., Hicks v. Com'r*, 2016 WL 7634457 (Barrett, J., reducing Ms. Pehowic's fee from hypothetical rate of $1414 per hour to $360 per hour); *Boston v. Com'r of Soc. Sec.*, 2014 WL 49858 (S.D. Ohio, Jan. 7, 2014), adopted at 2014 WL 1814012 (S.D. Ohio, May 7, 2014)(Weber, J., reducing Ms. Pehowic's fee from effective rate of $684 to $400); *Stonitsch v. Com'r,* 2012 WL 5378744 (S.D. Ohio Oct. 30, 2012) (Spiegel, J., reducing Ms. Pehowic's fee from effective hourly rate of $600 to $360).

Virtually none of the cases relied upon by Ms. Pehowic cite *Lasley*. Instead, they cite (or adopt the reasoning of) *Pickett v. Astrue*, 2012 WL 1806136 (S.D. Ohio May 17, 2012), a pre-*Lasley* decision. In *Pickett*, the court awarded an effective rate of $709 per hour based upon a lack of "impropriety" by counsel and the fact the plaintiff "voluntarily entered into the contingency fee agreement with counsel and counsel undertook and assumed the risk of non-payment, which is the nature of contingency fee agreements." *Id.* at *2. The undersigned finds that reasoning to greatly overemphasize the contingent nature of the agreement in a manner that is incompatible with controlling case law. Following that reasoning, there would be virtually no multiplier that could not be justified based on the "risk of nonpayment" inherent to contingent fee work and the claimant's "voluntary" contractual agreement.

On the other hand, the undersigned rejects, as equally contrary to *Gisbrecht* and *Hayes*, the Commissioner's suggestion that a fixed multiplier of 2 is "an appropriate rate in this jurisdiction" (Doc. 23 at 5), or that a slightly higher multiplier that results in an

hourly rate of $400 "may be the new recognized *maximum* in this jurisdiction." (*Id.* at 9, emphasis added). In most of the cases cited by the Commissioner, the §406(b) motions also were unopposed.

Courts must be willing to approve multipliers above the *Hayes* "floor" when appropriate. At the same time, *Hayes* suggests that the higher the multiplier/rate, the more closely an award should be reviewed for windfall. Even where counsel's conduct is above approach and achieves a good result, the contingent fee to which the claimant agreed may still be too much.

### 2. Administrative and Judicial Delay Not Attributable to Counsel

Thirty-six years ago, the Sixth Circuit set forth its first mathematical equation to use as a safeguard against windfall awards, holding that "[i]n no event should the fee exceed 25% of the past-due benefits that would have been due if judgment had been rendered within three months [of the case being submitted to the district court]." *Webb v. Richardson,* 472 F.2d 529, 538 (6th Cir. 1972), *overruled on other grounds, Horenstein v. Sec'y of Health and Human Servs.,* 35 F.3d 261 (6th Cir. 1994)(*en banc*). In *Webb*, judicial delay resulted from an "unconscionable" court practice that continued disposition of social security cases for periods of years. *Webb*, 472 F.2d at 538. Even though counsel's conduct played no part, *Webb* broadly cautioned courts to

> be especially hesitant to award the statutory maximum in cases in which delays of any consequence have occurred....*A fortiori*, courts should not award the statutory maximum when final decision has been deferred out of all proportion to delay reasonably incident to the normal course of litigation. Otherwise, as this case illustrates, the intent of Congress to eliminate contingent fees of as high as 50% would be frustrated because the fee awarded would amount to much more than 25% of the past-due benefits that would have accrued if the claim had been expeditiously

upheld.

*Webb v. Richardson*, 472 F.2d 529, 537–38 (6th Cir. 1972).

Fifteen years later in *Dearing v. Sec'y of Health and Human Servs.*, the Sixth Circuit again lamented delays that "although not chargeable in this case to any fault of counsel, had the effect of substantially increasing the maximum amount of allowable attorney fees if based upon a percentage of the entire amount of accumulated benefits." *Id.*, 815 F.2d 1082, 1083 (6th Cir. 1987). Admonishing trial courts, *Dearing* wrote:

> While *Webb v. Richardson* appears to have been largely ignored elsewhere in the circuit, its holding has not been disturbed by any subsequent decision of our court since first published in 1972. We write at this time specifically to express continued adherence to that rule in this circuit and we find its rationale still valid.

*Id.* *Rodriquez* also reaffirmed the *Dearing* formula, instructing that it applies "even though the delay [is] not due to the fault of counsel." *Id.,* 865 F.2d at 747.

Despite that reiteration, the *Dearing* formula is rarely cited and largely has been forgotten.[29] When it is cited, courts reason that its formula applies only when the delay has occurred at the judicial level, rather than when delay has occurred at the administrative level. Notwithstanding its forgotten formula,[30] *Dearing's* concern with the

---

[29]Shepard's citations for Dearing reflect 55 case citations, only 44 of which referenced its formula that "such fees may not …be greater than 25 percent of the amount of back benefits accumulated by three months after the case was ready for decision by the district court." *Dearing*, 815 F.2d at 1084. In contrast, the *Hayes* test has been cited by 335 cases. Even when cited, only a handful of cases have applied *Dearing*, typically when counsel has offered the calculation. *See e.g., Watkins v. Com'r*, 2016 WL 590471 (S.D. Ohio Feb. 11, 2016); *Sparks v. Colvin*, 2014 WL 2833928 at n.2 (N.D. Ohio June 23, 2014); *Nehls v. Astrue*, 2010 WL 1258081 (S.D. Ohio March 26, 2010)(directing counsel to address *Dearing* issue).

[30]*Dearing's* express language forbids awarding fees "greater than 25 percent of the amount of back benefits accumulated by three months after the case was ready for decision by the district court." *Id.*, 815 F.2d at 1084. The formula is cumbersome. First, the court must examine the dates in the Notice of Award to calculate the number of months that the past-due benefits award represents (X), and then review the judicial record to calculate how many months were "unearned" by counsel (Y). The formula can be expressed as $X - Y = Z$, with Z representing the remaining months as to which a fee was "earned." One can either then multiple Z times the monthly benefit amount (B) x 25% (the contingent portion of the fee), or alternatively, calculate the percentage of the total award against which the 25% contingent fee applies.

unearned benefit of extraordinary delay continues to be a significant driver in the windfall analysis.  As one court put it:

> It seems perverse that an ultimately successful disabled claimant should be further punished by the delays of the administrative process. Thatch filed her application on March 24, 2006. It was more than 5 years later before she was ultimately successful. Thus, for five years, Thatch was disabled and not receiving the benefits to which she and her child were entitled by law. By not taking into account this administrative delay in evaluating a request for attorney fees, the claimants are punished twice. First, they do not receive their benefits in a timely manner. Second, their retroactive benefits are reduced by 25% for the full length of the administrative process. Thus, the only party ultimately benefitting from such a delay is the attorney.

*Thatch v. Com'r of Social Sec.*, 2012 WL 2885432, at *6 (N.D. Ohio 2012).[31]

The same presiding judge assigned to this case has expressed similar concerns, citing the principle of *Dearing* as a basis for reducing an unopposed §406(b) fee as a windfall, where most of the delay occurred at the administrative level, after remand by this Court, and even though counsel played no part in that delay.  See *Willis v. Com'r of Soc. Sec.*, Case No. 1:10-cv-594, 2014 WL 2589259 at *5-6 and n.3 (S.D. Ohio June 10, 2014)(Barrett, J.)(reducing §406(b) award in part because "an estimated one-third of Plaintiff's past due benefits accrued" during administrative delay after remand, citing cases supporting similar reductions for administrative delay); *see also Woods v. Colvin*, 2014 WL 2918454 at *6 (finding delay at administrative level more relevant when fee exceeds *Hayes* test); *Boston v. Com'r of Soc. Sec.*, 2014 WL 49858 (reducing Ms. Pehowic's fee based in part on seven years' delay in award of benefits, most of which occurred at administrative level, despite finding *Dearing* "not directly applicable").

---

[31]Most of the delays that occurred in this case were at the administrative level, though the judicial process also took somewhat longer than usual.  Briefing before the court was completed in January 2013. Although the R&R was not filed until December 2013, remand was recommended within three months of the case being reassigned to the undersigned magistrate judge. *But see Thornburg v. Sec'y of Health and Human Servs.*, 888 F.2d 128 (1989)(Table, *per curiam*) (stating that the three months does not begin to run until an R&R is filed).

Where the amount of elapsed time from onset of the disability to the Notice of Award is more than a decade as in this case, there is a significant likelihood that the past-due benefits award will be "inordinately" large, and that the corresponding contingent fee will be "unearned" and unreasonable solely because of the length of time that benefits have accrued.   The crux of the issue is whether the attorney or the disabled claimant should bear the greater risk for unusually long delay, whether at the administrative or judicial level.[32]   *Gisbrecht* and Sixth Circuit case law teach that the contingent fee should be reduced in such cases.

In some future case, a reviewing court may craft a temporal framework that will be more straightforward than *Dearing*'s formula.   In the absence of more definitive authority, and in the spirit of *Hayes* simplicity, the undersigned suggests that a contingent fee based on a past-due benefits award that reflects a period of less than four years is unlikely to constitute a windfall.[33]   A contingent fee based on a past-due benefits award that reflects a period longer than four years may well be approved as reasonable, but invites a closer look.   In this case, a contingency fee applied to more than a decade's worth of past-due benefits, including the accrual of more than three years' worth of benefits after remand was recommended, should give any court pause. The slow pace of justice for Mr. Ringel clearly resulted in an inordinately large past-due award.   While Ms. Pehowic is to be commended for her patience and persistence

---

[32] *But contrast Madura v. Com'r*, 2013 WL 1386330 (S.D. Ohio April 4, 2013)(Black, J.)(characterizing the §406(b) dispute as between the Commissioner and the Plaintiff, rather than as one between the disabled Plaintiff and his/her attorney, describing the Commissioner's reference to the long delay as "disingenuous," because the delay was ultimately attributable to the Commissioner's denial of the claim).

[33] The suggestion of a 4-year time period is based on a review of a combination of resources, including the 2016 Full Report to the Judicial Conference, and both published and unpublished case law reviewed in connection with this R&R.   *See, e.g., Lasley* (award spanning 4 years 8 months, more than a year of which occurred after the R&R recommending remand); *Jeter* at 375, (6 years); *Lowery*, (6 years 10 months); Webb (6 years, 11 months).   However, no temporal rule is absolute; instead, such a rule should be interpreted in a manner both similar to, and subject to, the *Hayes* floor.

(particularly at the administrative level which is not compensable by this Court), the fact remains that she spent only 19.5 compensable hours on this case under §406(b). Having endured the injury of being disabled for more than a decade without access to the benefits to which he was entitled, Mr. Ringel should not be further penalized by an unreasonably large reduction of his long-awaited benefits in favor of his attorney.

### 3. The Quality and Quantity of Hours Guidepost

Though related to the *Hayes* test, the quality and quantity of hours provides its own guidepost when calculating a reasonable contingent fee, and may have some bearing on the degree of difficulty of a particular case. For example, a case in which the Commissioner jointly agrees to a remand would typically require fewer hours than one that requires full briefing. *See also Hayes*, 923 F.2d at 422 (approving discretionary consideration of "what proportion of the hours worked constituted attorney time as opposed to clerical or paralegal time and the degree of difficulty of the case")(internal quotations and citations omitted).

However, contrary to Ms. Pehowic's arguments that a higher fee is warranted based on her efforts at the administrative level, this Court is legally prohibited from considering time other than spent before this Court under 42 U.S.C. §406(b). In short, compensation is restricted to the 19.5 hours of work performed for the one and only appeal filed in this forum. *See also Horenstein v. Sec'y of Health & Human Servs*., 35 F.3d 261.

Because they are appeals not trials, and for a host of other reasons including a sequential review process that limits the types of claims, the vast majority of social security cases reflect a very standardized number of attorney hours, typically between 10 and 40 hours, with most (based on the undersigned's review) falling near the

midpoint of a 12-30 hour range. *See generally Glass v. Sec'y of Health & Human Servs.*, 822 F.2d 19, 20 (6th Cir.1987)(observing typical range of "twenty to thirty hours"); *Hayes*, 923 F.2d at 420 (noting trial court's reference to thirty to forty hours). In *Rodriquez*, the Sixth Circuit explained that the routine nature of most social security appeals should inform a trial court's analysis of a "reasonable" fee versus a windfall:

> Although we recognize that there are cases where the lawyer's unusual skill or diligence wins the case, typically the number of hours that are required to prosecute an appeal from the Secretary's determination will not vary greatly and will bear little if any relationship to the results achieved. <u>Where a case has been submitted on boilerplate pleadings, in which no issues of material fact are present and where no legal research is apparent, the benchmark twenty-five percent of awards fee would obviously be inappropriate.</u> The reviewing courts should not hesitate to make reductions in such situations, and at the other end of the spectrum should only allow maximum fees for extensive effort on the part of counsel who have overcome legal and factual obstacles to the enhancement of the benefits awarded to his client.

*Rodriquez*, 865 F.2d at 747 (emphasis added, footnote omitted); *see also Bailey v. Heckler,* 777 F.2d at 1170 n. 3 ("[T]his court has stressed that given the general lack of correlation between the *amount* of a social security award and the attorney's performance, courts should hesitate to grant 'routine approval' of the statutory maximum contingency fee") (emphasis original, additional citation omitted).

While relevant, the number of hours alone, when within the standard range, will seldom be determinative. An unusually high number may signal greater difficulty, but also could reflect the expenditure of "unnecessary hours" that do nothing but reduce the effective hourly rate below the *Hayes* floor. *See Jeter*, 622 F.3d at 381 (noting that attorneys could have "a perverse incentive to delay proceedings or expend unnecessary hours" if courts focus exclusively on the hourly rate). In addition, experienced attorneys (including Ms. Pehowic) may be able to complete a case in fewer hours within the

typical range than would a newer attorney. In such cases, counsel should not pay a penalty for efficiency.

In this case, the issues presented in Mr. Ringel's appeal were not novel or complex, but represent routine claims. The case did not require any level of federal appellate review beyond this Court. Under *Rodriquez*, such factors favor a reduction of fees. In her reply, Ms. Pehowic points out that the Commissioner does not argue that she expended "minimal effort" or that she acted improperly or provided ineffective assistance. But again, the fact that counsel was guilty of no misconduct does not immunize her fee from windfall reduction. Nor does the fact that Ms. Pehowic's work can be described as "simple and routine" detract from the reality that she performed her job admirably, achieving a significant benefit on Mr. Ringel's behalf.

Consistent with the high volume nature of social security practice,[34] and to illustrate the routine nature of the work performed in this case, the undersigned undertook review of five appeals filed by Ms. Pehowic in the same month as Mr. Ringel's case.[35] As expected, each case was initiated with a virtually identical "boilerplate" complaint. Each of the five Statements of Errors liberally cites well-established case authority and arguments, reflecting no significant legal research, but instead tailoring standard arguments to the medical record in each case.[36] Each Statement is formulaic, beginning with a regurgitation of the claimant's medical history and standard of review applicable to this Court. Mr. Ringel's case involved just two

---

[34]2016 Full Report at 127; *see also* Doc. 19-1, Affidavit of Ms. Pehowic, stating that at any one time she typically represents over 400 Social Security clients.
    [35]The undersigned would be hard-pressed to find sufficient time to so closely scrutinize every case with a particular attorney's similar filings, but undertook this analysis in this case solely for purposes of illustration.
    [36]This in no way is intended to denigrate the competency of Ms. Pehowic, as her skills are evident in tailoring each argument, but simply to illustrate the point made in *Rodriquez* and by other commentators regarding the routine nature of the legal arguments made in the vast majority of social security appeals.

claims developed over 9 pages: (1) the improper evaluation of medical opinion evidence; and (2) the improper evaluation of his credibility. All five of the cases filed by Ms. Pehowic that month included the first claim, and three included the improper evaluation of the claimant's credibility.[37]

In addition to pointing out the routine nature of Mr. Ringel's case, the Commissioner quibbles with a few of Ms. Pehowic's hours, noting the relative brevity of hours spent on brief-writing (consistent both with the routine arguments and Ms. Pehowic's experience), but contrasting other time entries that suggest clerical or administrative time, or otherwise appear excessive for the nature of the task (*i.e.*, 2 hours for that 1.5 page boilerplate complaint). In her reply, Ms. Pehowic implies that the Commissioner should be deemed to have waived any concerns with the number of hours, because the Commissioner filed no objection to those same 19.5 hours in opposition to her EAJA motion. "It would be entirely inappropriate for Plaintiff to submit a different timesheet with the Application for EAJA fees and expenses as compared with the current motion for fees under §406(b), since both requests for fees relate to the same body of work." (Doc. 24 at 5).

The undersigned finds no waiver. In the context of the EAJA petition, the much smaller fee award may not have merited the Commissioner's time in a cost/benefit analysis. Admirably, given the fact that the Commissioner does not reap any direct benefit, the opposition to the § 406(b) motion has been filed not to represent the Commissioner, but on behalf of the disabled claimant whose interests in retaining his

---

[37] *See, e.g., Barnes v. Commissioner*, Case No. 1:12-cv-529 (improper evaluation of medical opinion evidence and assessment of credibility); *Winans v. Commissioner*, Case No. 1:12-cv-539 (improper evaluation of medical opinion evidence); *Thacker v. Commissioner,* Case No. 1:12-cv-545 (improper evaluation of medical opinion evidence); *Ceasar v. Commisioner*, Case No. 1:12-cv-548 (improper evaluation of medical opinion evidence and assessment of credibility).

benefits and proportional risk of loss are much greater.  And, while the undersigned expresses no view on the propriety of claiming a smaller number of hours under §406(b), the law requires a reduction under § 406(b) to avoid a windfall.  If no other factor favored reduction, the undersigned may well approve the hours as reasonable overall, since they fall within the standard range.  However, in combination with the other factors discussed, the quality and quantity of hours expended on such routine claims favor a downward adjustment of fees in this case.

### 4.  Whether Counsel Has Already Compromised The Fee

In many unpublished cases in which an unusually high effective hourly rate has been awarded, the trial court will do so after noting that the fee requested does not, in fact, represent the full contracted amount.  In those cases, courts point out that the motions reflect a voluntary compromise of the contingent fee well below the agreed-upon 25%, in recognition of the fact that the contract would result in a windfall.  *See, e.g., Lowery*, 940 F. Supp.2d 689 (granting unopposed motion where counsel sought only 14.5% of past-due benefits representing an effective hourly rate of $406, rather than full contingent fee); *Willis v. Com'r*, 2014 WL 2589259 at *5 ("While counsel is not required to seek less than the 25 percent contingency fee, a discounted fee or the lack thereof is relevant to a reasonableness determination")(collecting cases); *Reynolds v. Com'r of Soc. Sec.*, 292 F.R.D. 481, 485 (W.D. Mich. 2013)(permitting fee despite delay in filing motion, where counsel had significantly and voluntarily reduced requested award to an amount representing 17% of benefit award in lieu of 25%); *Childers v. Astrue*, 2012 WL 4757828 (S.D. Ohio, Oct. 4, 2012)(approving unopposed fee that represented effective rate of $634, in part because counsel had voluntarily reduced request from 25% to just over 10% of benefit award).

This factor can put counsel in the difficult position of bidding against themselves, as it were, by offering to take a significantly reduced fee in lieu of the contracted amount agreed to by their clients. Yet, the statute authorizes only a "reasonable" fee, which does not include a windfall. Application of *Hayes* and similar guideposts continue to alert both counsel and courts of whether further windfall review is warranted. In cases where the *Hayes* test or significant delay suggest possible windfall, the extent to which counsel has offered to compromise the fee (or failed to compromise) will be more relevant. *See Willis*, 2014 WL 2589259 at *5 (holding that voluntary reduction "is particularly relevant where, as here, the Court's judgment was followed by an administrative delay in the final award of past-due benefits").

In this case, Ms. Pehowic's initial motion reflects small compromise. She seeks "25% of Plaintiff's past due benefits withheld ($32,735.75) less the EAJA fees ($3,315.00) previously awarded to Plaintiff's counsel, and less the amount of fees ($6,000.00) expected to be awarded to Plaintiff's counsel for work performed at the administrative level"). (*See* Doc. 21 at 6).

The first "subtraction" of the EAJA fee, prior to the *Hayes* calculation, is misguided. After subtracting the EAJA fee, Plaintiff reports seeking only $23,420.75, rather than a total fee of $26,735.75. This common error leads Ms. Pehowic to mistakenly calculate her effective hourly rate as $1,201 per hour rather than the true rate of $1,371 per hour.

It is true that the EAJA's Savings Clause bars duplicative awards, and that an attorney who recovers a second, larger fee under 42 U.S.C. §406(b) must refund the

duplicate EAJA fee to the claimant.[38]   However, the effective hourly rate can be calculated only prior to the subtraction of the <u>duplicate</u> prior EAJA award; subtracting the EAJA award from the total fee sought is incorrect, as the EAJA fee is a wash.[39] Here, Ms. Pehowic seeks a total fee of $26,735.75.   Her effective hourly rate is calculated by reference to that total (including her prior EAJA award) divided by the total number of hours expended.  The return of an EAJA fee is not a compromise and does not reduce the effective hourly fee sought but only prevents double recovery for the same work.

Ms. Pehowic's second subtraction, of the $6,000 she will receive for her work performed at the administrative level under 42 U.S.C. §406(a), is consistent with the Social Security Administration's retention of an aggregate 25% of the past-due benefits in its Notice of Award.  It is unclear whether Ms. Pehowic intended that subtraction to reflect a voluntary compromise of her fee.  However, in contrast to the subtraction of the EAJA offset, the subtraction of a fee received for work performed at the administrative level does constitute a true "compromise" under Sixth Circuit precedent.

The Agency's withholding practice is consistent with the view of several circuits which hold that the 25% cap on attorney's fees applies to the <u>aggregate</u> of fees paid for counsel's work performed both at both the administrative level and in federal court. *See, e.g., Wood v. Com'r of Soc. Sec.*, 861 F.3d 1197, 1205-06 (5th Cir. 2017)

---

[38]In this district, courts usually apply the EAJA award as an offset against the § 406(b) award.

[39]Example:  Attorney is paid $1,800 for 10 hours of federal court work under the EAJA. Past-due benefits are awarded in the amount of $48,000.  Attorney seeks $12,000 under §406(b), but promises to return the $1,800 EAJA fee as required to avoid double-payment.  If an offset is used for convenience, the net additional fee would be $10,200, reflecting 25% of a large past-due benefits award (the full $12,000) less the offset/return of the earlier EAJA award.  The offset provides only a convenient shortcut to the need for counsel to write a check to return the $1,800 overpayment. The offset prevents a double recovery but does not reduce the total fee award.  The total fee remains $12,000 and represents an effective hourly rate of $1,200: [$1,800 (EAJA fee previously awarded) + $12,000 (§406(b)(1) fee requested) - $1,800 (fee to be refunded to Plaintiff) = $12,000].

(discussing circuit split, reiterating holding that the 25% cap on attorney's fees applies to the aggregate or combination of § 406(a) and §406(b) fees); *Morris v. Soc. Sec. Admin.*, 689 F.2d 495 (4th Cir. 1982)(same). However, in the Sixth Circuit, the 25% cap on attorney's fees applies <u>only</u> to fees awarded under §406(b), and has no bearing on the separate award of §406(a) fees made by the agency. *Horenstein*, 35 F.3d 261; *accord Wrenn ex rel Wrenn v. Astrue*, 525 F.3d 931, 937-38 (10th Cir. 2008); *Clark v. Astrue*, 529 F.3d 1211, 1214-1215 (9th Cir. 2008)(collecting cases). The impact of the Sixth Circuit's approach increases the amount of payment that may be recoverable by plaintiff's attorneys, since they are permitted to seek the full 25% of past-due benefits under § 406(b) without any reduction to account for the agency's payment under §406(a).[40] Thus, Ms. Pehowic's initial motion for fees seeks an unusually high effective hourly rate of $1,371, but still reflects some "compromise" to the extent that her contingent fee contract and *Horenstein* allow a maximum total award of $32,735.75, at an effective rate of $1,678.75.

Ms. Pehowic's reply memorandum offers greater compromise, reducing her effective rate to $750 per hour, for a total award of $14,625, a sum that is less than half the maximum fee she could have sought under Sixth Circuit law. That degree of compromise is significant, but must be considered in proportion to other guideposts, including the significant delay in this case. *Compare, e.g. Jones v. Com'r of Soc. Sec.*, 2017 WL 1745569 (S.D. Ohio May 4, 2017)(where Ms. Pehowic initially sought $2217

---

[40]Of course, an attorney who seeks to recover a full 25% contingent fee under *Horenstein* may face practical challenges to recovering the additional payment directly from his/her disabled client. *See Booth v. Com'r of Soc. Sec.*, 645 Fed. Appx. 455 (6th Cir. 2016)(pointing out that Administration's Program Operations Manual System (POMS) permits Commissioner to withhold only an aggregate 25% for payment of attorney's fees, holding that Commissioner cannot be compelled to pay additional §406(b) fee after those funds have been disbursed, but that counsel must seek payment directly from his client).

per hour, but after opposition by Commissioner, offered proportionally greater compromise to $750 per hour in her reply; court awarded rate of $580 per hour).

### 5. The Commissioner's Opposition and other Miscellaneous Factors

In addition to the *Hayes* test, the amount of delay, the quantity and quality of hours, and any attorney compromise of his/her fee, a fifth guidepost is whether the Commissioner has filed any opposition. As discussed above, such opposition is relatively rare, and is taken seriously in this case.

Because fee awards ultimately require the exercise of discretion, the list of five guideposts set forth above is not intended to be exhaustive. While not as common, additional factors that may warrant a reduction include: (1) whether counsel failed to first seek a fee under the EAJA (since that fee is paid by the Commissioner); and (2) whether specific language in the fee contract provides for an "aggregate" approach to the 25% cap, or if some other contractual element disfavors an award of the statutory maximum fee. *See, e.g., Jones v. Com'r of Soc. Sec.*, 2017 WL 1745569 (S.D. Ohio May 4, 2017)(reducing Ms. Pehowic's fee based upon her failure to submit an EAJA application on her client's behalf prior to filing her §406(b) motion, collecting cases); *Damron v. Com'r of Soc. Sec.*, 104 F.3d 853, 856 (6th Cir. 1997)(fee not truly contingent where no fee agreement signed until after benefit award was made).

Additionally, the undersigned recognizes that her determination of a "reasonable" fee may not be identical to the discretionary determination by another magistrate judge or district judge. But that does not mean that courts cannot be consistent in their approach. So long as the referenced guideposts are used as such to determine reasonableness, without "automatically" approving or disallowing any fee, then greater consistency should result.

### D. The Scope of Review

Like the underlying appeal that generated the R&R recommending remand in this case, the motion for attorney's fees is considered to be dispositive. *McCombs v. Meijer, Inc.*, 395 F.2d 346, 360 (6th Cir. 2005); *see also Massey v. City of Ferndale*, 7 F.2d 506, 510-511 (6th Cir. 1993); Fed. R. Civ. P., Rule 54(d)(2)(D) (providing for the referral of attorney's fee motions to magistrate judges). This R&R sets forth the guideposts used to inform judicial discretion and define when a contingent fee may constitute a windfall under §406(b), consistent with controlling case law, as well as persuasive authority. Although the undersigned has endeavored to exercise her judicial discretion in a manner consistent with those guideposts, the referral of a discretionary motion does not alter the *de novo* standard of review applicable to any objections made by the parties to the district judge. *See McCombs v. Meijer, Inc.*, 395 F.3d at 359–60.

At the same time, the discretionary nature of the fee award may limit the scope of appellate review. In *McCombs*, the Sixth Circuit explained that its own review of such awards falls "under the same standard as evidentiary determinations and [we] will therefore 'usually sustain a district court's award and division of attorneys' fees absent an abuse of discretion.'" *Id.*, 395 F.3d at 359–60 (affirming district judge's one-page order adopting R&R on fee award over objections, where Court stated it had "reviewed the comprehensive findings of the Magistrate Judge and considered *de novo* all of the findings in this matter," citing *Dean v. Holiday Inns, Inc.,* 860 F.2d 670, 672 (6th Cir.1988)); *accord Damron v. Com'r*, 104 F.3d 853, 856 (6th Cir. 1997)("This court will reverse a [SSA] fee award decision upon finding an abuse of discretion").

### III.    Conclusions and Recommendations

Under *Gisbrecht*, this Court begins with the contingency fee agreement, which here authorized the statutory maximum fee of 25% of the past-due benefits award. Because the motion was timely filed under Local Rule 54.2 with no evidence of attorney misconduct, the *Hayes* test is applied to determine whether further analysis is warranted to prevent a windfall. The standard EAJA rate previously awarded for the same work is presumed to apply for that test.

Ms. Pehowic's initial motion sought a fee 8 times the standard rate, well above the *Hayes* floor.  Even in her reply memorandum, she continues to seek an award that is 4.4 times her previously awarded standard rate.

When the requested fee exceeds the *Hayes* floor, as it does here, the Court will further consider the following guideposts: (1) the number of years that past benefits have accrued and whether extraordinary delay has resulted in an inordinately large past-due benefits award (without regard to any fault of counsel); (2) the quality and quantity of hours, including the typicality of claims, the efficiency of the attorney performing those hours, and any non-compensable work; (3) the extent to which counsel has compromised the fee; and (4) whether the motion is opposed by the Commissioner, and/or any other factors that provide a reasoned basis for the exercise of discretion.

On the record presented, four of the five factors favor some reduction (the *Hayes* test, the extraordinary delays that resulted in an inordinately high past-due benefits award, the quality and quantity of hours, and the Commissioner's opposition). Counsel's somewhat belated offer to significantly compromise her fee lessens the need for reduction, but must be viewed in the context of, and in proportion to, the record as a

whole. All in all, the undersigned recommends that a "reasonable" fee be awarded in the amount of $11,700. That sum reflects an effective hourly rate of $600, which - at more than 3.5 times counsel's standard rate – adequately compensates her for the contingent nature of her contracted fee for work performed in this Court,[41] without straying into the realm of a windfall at the expense of her long-suffering client.

Accordingly, **IT IS RECOMMENDED THAT:**

1. Plaintiff's motion for an award of attorney's fees under 42 U.S.C. § 406(b) (Doc. 21) should be GRANTED only in part;

2. Counsel should be paid a total of $11,700.00 for the 19.5 hours of work performed in this Court, subject to an offset of the EAJA fee previously paid to her for the same work. Therefore, Ms. Pehowic should be awarded an additional fee under 42 U.S.C. §406(b) of $8385.00, reflecting the total award of $11,700.00 less the offset of $3,315.00.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

---

[41]As previously noted herein, Ms. Pehowic acknowledges her separate award of $6,000.00, under 42 U.S.C. §406(a), for the work she performed at the administrative level.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CHARLES RINGEL,                                        Case No: 1:12-cv-521

                    Plaintiff,                         Barrett, J.
          v.                                           Bowman, M.J.

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).